Rockingham, ⎱
Sept. 6, 1904. ⎰

### STATE *v.* RAMSEYER.

The statute designed to prohibit the use of trading-stamps by merchants (Laws 1899, *c.* 60) is not a valid exercise of the police power, and is void as an unwarrantable interference with the constitutional right of acquiring and possessing property.

INFORMATION, by the solicitor, which the defendant moved to quash. The motion was denied, and the defendant excepted. Transferred from the April term, 1903, of the superior court by *Stone,* J.

The information charges that the defendant, on April 16, 1903, at Portsmouth, sold "to one Charles E. Jenness certain property, to wit, one pocket-book, and in connection with such sale did give to said Jenness ten stamps or coupons which entitled said Jenness, the purchaser of said pocket-book, to receive from the Sperry & Hutchinson Company, a corporation organized under the laws of the state of New Jersey, certain property other than the property

sold as aforesaid, to wit, other than the said pocket-book, on presentation to said Sperry & Hutchinson Company, being a person or corporation other than the person so selling said pocket-book as aforesaid."

It was agreed that the witnesses for the state, if called, would testify as follows: The defendant, acting as a clerk in a dry goods store in the city of Portsmouth, on the day specified in the information sold to the person named therein a certain pocket-book, and at the same time and as part of the transaction delivered to that person ten stamps or coupons, which entitled the purchaser to demand of the Sperry & Hutchinson Company any one of a number of articles on exhibition at the store of that company which the purchaser might select; that the Sperry & Hutchinson Company is a corporation organized under the laws of the state of New Jersey, and is not the proprietor of the store where the pocket-book was sold and where the coupons or stamps were delivered to the person named in the information.

*John W. Kelley*, solicitor, and *Streeter & Hollis*, for the state.

*Tillinghast & Murdock* (of Rhode Island), for the defendant.

WALKER, J.   The facts constituting the alleged crime, as set forth in the information, are in brief that the defendant, upon the sale by him to one Jenness of a pocket-book, also gave to the latter a coupon or order which entitled the holder to receive from another party some other article of value.   It may be assumed in favor of the state that it was understood by Jenness, when he purchased the pocket-book, that as a part of the transaction, and as an inducement thereto, he was to receive, and in fact did receive, from the defendant, a coupon authorizing him to demand of and obtain from a third party other property than the article bought of the defendant.   This transaction on the part of the defendant, it is claimed, constituted a crime by virtue of sections 1 and 2, chapter 60, Laws 1899.   Section 1 of the statute is as follows: "No person or company shall, in the sale, exchange, or disposition of any property, give or deliver in connection therewith or in consideration of said sale, exchange, or disposition, any stamp, coupon, or other device which entitles the purchaser or receiver of said property, or any other person, to demand or receive from any person or company other than the person making said sale, exchange, or disposition, any other property than that actually sold or exchanged; and no person or company other than the person so selling or disposing of property shall deliver any goods, wares, or merchandise upon the presentation of such stamp,

coupon or other device." Section 2 provides that "any person or company who violates any provision of the foregoing section shall for each offence be punished by fine of not less than twenty nor more than five hundred dollars." That the facts alleged in the information state a crime within the literal meaning of the statute may be conceded. The defence is that the statute is unconstitutional and void.

While it may be difficult to define exactly or concretely the constitutional limitations upon the legislature in the exercise of its regulating or police power, it is futile to argue that none exist. It has been so long and so universally recognized and established that the legislature does not possess unlimited power in the enactment of statutes affecting private rights, that discussion of the subject at this late day assumes only academic interest. In the practical administration of justice it can be of little, if any, utility. "All men have certain natural, essential, and inherent rights, among which are the . . . acquiring, possessing, and protecting property." Bill of Rights, *art.* 2. "This is not silence, nor rant and declamation, nor advice and exhortation; it is an express declaration of the private right of proprietorship. It is attached to the constitutional grant of governmental powers, as a limitation of the grant, a declaration of a right not surrendered to society. Whether it be called a declaration of the reserved right, or a reservation of the right, or a guaranty of it, or a prohibition of the violation of it, is immaterial. It is a reservation that makes the right a constitutional one. It is a guaranty of the plaintiff's natural and common-law right to own property. . . . As the broadest, literal sense of this reservation is qualified by the constitutional grant of legislative powers (including the powers of police, taxation, and eminent domain), so that grant is qualified by this reservation, as well as by other guaranties and prohibitions set forth in the bill of rights. If the general reservation of the rights of life, liberty, and property were not qualified by the grant of legislative power, individual rights would be absolute, and the constitution would contradict itself. If the grant of 'supreme legislative power' were not qualified by any constitutional provisions, that power would be unlimited." *Doe,* J., in *Orr* v. *Quimby,* 54 N. H. 590, 616, 617.

"The general court is the legislative department of the state government, and has under the constitution an ample grant of legislative power; the extent of the power is, however, limited, not only by the express prohibitions of the constitution, but by the nature itself of the power granted; and to be valid and binding, the act of the legislature must be within the general scope of legislative authority. The power delegated by the constitution

'to make and ordain all manner of reasonable and wholesome orders, laws,' etc., confers no authority to make an order or law in plain violation of the fundamental principles of natural justice, though the act may not be prohibited by any express limitation in the constitution." *East Kingston* v. *Towle*, 48 N. H. 57, 59. "The right of acquiring and possessing property is constitutionally reserved." *State* v. *Express Co.*, 60 N. H. 219, 251.

"But even the police power, comprehensive as it admittedly is, has its limitations; and in this state, at least, it is subordinate to the equality of privilege and of burden secured by the bill of rights and guaranteed by the constitution in clearly expressed provisions which mean just what they declare." *State* v. *Jackman*, 69 N. H. 318, 331, 332. "The right of acquiring property and the rights of life and liberty, which the second article of the bill puts together in a class of rights there described as natural, essential and inherent, are secured for all men." *Opinion of the Justices*, 66 N. H. 629, 631; *Aldrich* v. *Wright*, 53 N. H. 398, 399, 400.

The limited power of the legislature in matters relating, or purporting to relate, to the general public welfare, has always been recognized and vindicated by judicial action. The rights of " enjoying and defending life and liberty, acquiring, possessing, and protecting property, and, in a word, of seeking and obtaining happiness " (Bill of Rights, *art.* 2), have been deemed to be not only in a certain broad and undefined sense "natural, essential, and inherent rights," but also in a practical sense enforceable rights. That the framers of the constitution did not concretely define these terms is no evidence that they were not intended to have an effective legal meaning. Nor is the broad grant of legislative powers contained in article 5 of the Form of Government, by which the legislature is authorized "to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions," independent of, or unlimited by, the reserved rights of citizenship mentioned in article 2 of the bill of rights. The true view is that both of these provisions of the fundamental law are to be considered together as interdependent, the one qualifying and limiting the other; otherwise it would result that due effect could not be given to both at the same time. Neither is supreme in a sense that would deprive the other of its effectiveness as a part of the fundamental law.

The fourteenth amendment to the constitution of the United States provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor, shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The essential rights of citizenship under a republican form of government, declared in the second article of our bill of rights, are not increased or rendered more stable and secure by this provision of the federal constitution. "An enactment obnoxious to this provision of the national constitution is in New Hampshire no more ineffective than it would be in its absence." *State* v. *Pennoyer*, 65 N. H. 113, 115. And as the defendant is fully protected in the exercise of all his essential rights of acquiring and possessing property by the constitution of this state, it is unnecessary to consider whether a similar guaranty might be discovered in the fourteenth amendment of the federal constitution.

The statute in question is prohibitive. It makes it a crime for one to carry on a legitimate business in a manner not before supposed to be illegal or improper. It deprives the citizen of a means of acquiring and possessing property, which previously he had possessed as of right; and such invasion and deprivation of private right can only be justified, if at all, by proper legislative action in the exercise of the police power. "No proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit." *People* v. *Marx*, 99 N. Y. 377, 386. Unless the power of the legislature to provide for the health, safety, comfort, and welfare of the public is sufficient to sanction such action, it is inimical to the constitution and void. "To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts." *Lawton* v. *Steele*, 152 U. S. 133, 137.

"The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the funda-

mental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution." *Mugler* v. *Kansas*, 123 U. S. 623, 661.

"While it is the general province of the legislature to determine what laws and regulations are needed to protect the public health, comfort, and safety, courts must be able to say, upon a perusal of the enactment, that there is some fair and reasonable connection between it and the ends above mentioned. Unless such relation exists, an enactment cannot be upheld as an exercise of the police power." *People* v. *Warden*, 157 N. Y. 116, 130; *People* v. *Marx*, 99 N. Y. 377; *People* v. *Gillson*, 109 N. Y. 389; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Powell* v. *Pennsylvania*, 127 U. S. 678; *Booth* v. *Illinois*, 184 U. S. 425, 429; *State* v. *Jackman*, 69 N. H. 318, 329, 330; *Commonwealth* v. *Perry*, 155 Mass. 117, 121; *State* v. *Dalton*, 22 R. I. 77; *Long* v. *State*, 74 Md. 565; *People* v. *Circuit Judge*, 124 Mich. 664; Tied. Pol. Pow., s. 85; Freund Pol. Pow., s. 494.

The act under which this prosecution was instituted cannot be· sustained as a valid exercise of the police power, or as a legislative· regulation for the general welfare, unless it can be so construed as to relate to fraudulent and deceptive schemes in the sale of prop-· erty by the use of a "stamp, coupon, or other device which entitles the purchaser or receiver of said property to demand or receive from any person or company other than the person making· said sale, exchange, or disposition, any other property than that actually sold or exchanged," or unless it relates to such transactions attended with some element of chance sufficiently alluring to· appeal to the gambling propensity. See *Commonwealth* v. *Emerson*, 165 Mass. 146. But the purpose of the act cannot be so limited, without incorporating into it language which was not only not used, but which was carefully excluded. Besides, it was unnecessary for the accomplishment of that purpose. Existing stat-· utes furnished an ample remedy. P. S., *cc.* 270, 273; *Wheeler* v. *Stock Exchange*, 72 N. H. 315. The evident purpose was to prohibit merchants from engaging in what is known as "the trading-stamp business"; in other words, to make it illegal for a trader in selling an article, and as a part of the transaction, to give the purchaser an order entitling the latter to obtain, without further payment, some other article of value from an independent third party. Fraud and deception are not made elements of the offence described, and the honesty and good faith of the parties to the transaction constitute no excuse or defence. It is the particular method of doing business that the legislature sought to prohibit. And the question for the court to decide is whether it had, under the constitution, power to pass a valid act of that character.

Upon a fair and reasonable construction of the act, is there any relation between it and the constitutional police power possessed by the legislature?

In *State* v. *Dalton*, 22 R. I. 77, this precise question was presented, and the court say (*p.* 85): "The act, as we construe it, prohibits a person from selling a given article, and at the same time, and as a part of the transaction, giving to the purchaser a stamp, coupon, or other device which will entitle him to receive from some third person some other well defined article in addition to the one sold. This is equivalent to declaring that it is illegal for a man to give away one article as a premium to the buyer for having purchased another; for, as already intimated, it can make no possible difference that the article given away with the sale is delivered to the purchaser by a third person instead of the seller himself. We think it is clear that such a prohibition is an unwarranted interference with the individual liberty which is guaranteed to every citizen, both by our state constitution and also by the fourteenth amendment to the constitution of the United States." On page 87 the court further say: "But it is further argued in support of the statute that the scheme aimed at is one which is demoralizing to legitimate business, and hence within the police power of the state to prohibit. . . . In this connection it is pertinent to observe that it is not enough to warrant the state in absolutely prohibiting a given business, that it is conducted by methods which do not meet with general approval. There must be something in the methods employed which renders it injurious to the public in some one of the ways before mentioned, in order to warrant the state in interfering therewith. Nor is it enough to bring a given business within the prohibitory power of the state, that it is so conducted as to seriously interfere with or even destroy the business of others."

The foregoing case, which presents a careful examination of the subject, is followed in *State* v. *Dodge*, 76 Vt. 197. The statute under consideration in *State* v. *Dodge* is identical with the statute in question in the case at bar. This coincidence renders it quite probable that the New Hampshire statute, passed in 1899, was copied from the Vermont statute, passed in 1898. In the case referred to, the court say: "It is not attempted by the act to regulate the giving of stamps or coupons redeemable in goods, wares, or merchandise by a person other than the giver of the stamp or coupon, but it absolutely prohibits . . . the carrying on of a branch of business or trade that is not affected with a public interest and has no relation to the public health, morals, or safety, and imposes an arbitrary and unnecessary restraint upon lawful business transactions, and, within the meaning of the fourteenth

amendment to the constitution of the United States, is an unlawful restraint upon the liberty of a person to make such contracts, not inconsistent with the lawful rights of others, as he judges for his best interest, and upon the use of his business capacities for a lawful purpose, and falls within the constitutional prohibition, and is not a lawful exercise of the police power of the legislature."

In *People* v. *Gillson*, 109 N. Y. 389, it was held that a statute prohibiting the sale or disposal of any article of food, or any offer or attempt to do so, upon any representation or inducement that anything else will be delivered as a gift prize, premium, or reward to the purchaser, is unconstitutional and void. The foregoing views are also recognized and enforced in the following cases: *Commonwealth* v. *Emerson*, 165 Mass. 146; *Commonwealth* v. *Sisson*, 178 Mass. 578; *People* v. *Dycker*, 72 N. Y. App. Div. 308; *Long* v. *State*, 74 Md. 565; *Young's Case*, 101 Va. 853, which expressly indorses and follows *State* v. *Dalton*; *State* v. *Shugart*, 138 Ala. 86; *Ex parte McKenna*, 126 Cal. 429.

If it is assumed that the testimony of the witnesses for the state, which is contained in the case, is true, it would not prove or authorize any inference that the business as thus carried on was injurious to the public. All suspicion of the existence of the element of a lottery is removed from the transaction by the virtual finding that the articles given as prizes or premiums on presentation of the coupons were on exhibition at the store of the third party. There was nothing to prevent the purchaser of the pocket-book from ascertaining in the first instance what article or articles he would obtain by virtue of the coupons to be given him by the defendant. And if he saw fit to purchase the pocket-book without deciding or knowing what premium he would select, it was his privilege to do so; his ignorance in this regard was not a condition of his contract with the defendant. That the element of chance might be introduced into the scheme, so that the purchaser could not know what he was to receive, but would be obliged to leave the selection of the premium to be determined by other means than his free choice (*State* v. *Clarke*, 33 N. H. 329, 335), is the assumption of pure speculation as a fact, upon which to predicate the validity of the statute. Most commercial transactions may be so conducted as to involve the element of chance to a pernicious degree. But this possibility alone would not justify the legislature in prohibiting any useful occupation it might select, or preclude the court from declaring the act unconstitutional. There is no presumption that men in business affairs will cheat, deceive, and defraud their customers. The evil effects of a business enterprise, when they exist, as a legal proposition are ascertained from its logical, or necessary, or usual results—not

from the fact that unscrupulous men may resort thereto for improper or illegitimate purposes.

The argument is advanced in behalf of the prosecution, that the ultimate effect of the existence of trading-stamp companies is the imposition of a compulsory, unnecessary, and useless tax upon the entire community, and hence is detrimental to the welfare and prosperity of the public. It may be that the strict, logical reasoning of political economy supports that conclusion, though it might not meet with universal acceptance. But however that may be, it is equally true that other methods of commercial enterprise, in the ultimate analysis, would turn out to be expensive to all and useful to few or none, entailing a public burden attended with no public benefit. If all merchants, for instance, expended a proportionally equal amount in advertising their wares in the newspapers and in other ways, the argument would not be difficult to establish the proposition that the business of advertising results in a useless and compulsory tax upon the community at large, and ought to be prohibited for that reason. If it necessarily results from the trading-stamp business that all retail merchants must eventually patronize the stamp companies, or go out of business, the same logic would authorize the conclusion that all traders must advertise their business, and that, in that event, the entire public would be subject to a large expense without deriving any benefit therefrom. But it is safe to assume that no court would long entertain the proposition that a statute prohibiting the advertiser's business was a valid exercise of the police power. The business against which the statute is aimed "is simply one of the infinite variety of devices which are resorted to by trades-people, in these days of sharp competition, to promote the sale of their goods." *State* v. *Dalton, supra.* "It does not differ from the ordinary business, except in the method of advertising and in lawful trade inducements. It is true that this method of doing business may enable a trader to do more business than he otherwise would, and more than his competitor across the street, who does not choose to incur the expense incident to this method of advertising and increasing his business; but this furnishes no reason for prohibiting the business." *State* v. *Dodge, supra.*

The case of *Lansburgh* v. *District of Columbia*, 11 App. D. C. 512, is not in point. The decision seems to be based upon facts, tending to show a lottery in the manner the stamp business was there conducted, which do not exist in this case, and cannot be judicially found to exist as a matter of speculation or inference. The case of *Humes* v. *Fort Smith*, 93 Fed. Rep. 857, which adopts the reasoning in *Lansburgh* v. *District of Columbia*, relates to a regulation, not the prohibition, of the stamp business.

The reasoning of the courts in the cases cited, in which the validity of statutes similar to the one involved in this case has been passed upon, and in which a similar question has been presented, seems to be conclusive in showing that the power sought to be exercised does not fall within the constitutional police power of the legislature. Considering the apparent object of the statute, ascertained by construing its language in the light of all competent evidence, the court is unable to discover how it promotes the public welfare as a police regulation. Indeed, the title of the act does not indicate such a purpose. It is denominated "An act to prevent the use of trading-stamps, coupons, and other devices on the sale or exchange of property." In the absence of sufficient evidence that it is a police regulation, it cannot be judicially declared to possess that character; and if it is not under the constitution an exercise of the police power, it finds no justification in that instrument, and is rendered invalid by the second article of the bill of rights. Whether its invalidity might be placed on other constitutional grounds, it is unnecessary to inquire.

In reaching this result, the court does not undertake to pass upon the reasonableness of the statute. If it appeared to have such connection with, or relation to, matters of public morals and safety as would bring it within the constitutional limits of the police power, vested in the legislative department, the question of its reasonableness as a means to an end, or of its policy or desirability, would not be a question for judicial determination. *State v. Jackson*, 71 N. H. 552, 554. That power is vested in the legislature, and is not subject to revision by the courts. If it is assumed that the statute in question is valid as an exercise of the police power, whether it is a wise statute under existing circumstances, whether the evil sought to be corrected should be suppressed in the manner proposed, and whether public policy sanctions or requires such legislation, are matters upon which the court could not hold the statute unconstitutional. *Commonwealth v. Alger*, 7 Cush. 53, 84; *Watertown* v. *Mayo*, 109 Mass. 315, 319; *Chicago* v. *Netcher*, 183 Ill. 104, 111; *Holden* v. *Hardy*, 169 U. S. 366, 398; *Otis* v. *Parker*, 187 U. S. 606, 608. But the legislative prohibition of a business not harmful to society in any of its essential features, though comparatively novel and peculiar, cannot receive judicial sanction, merely because the prohibited business stimulates competition among merchants in disposing of their wares, or affords an unusual method for commercial advertising.

*Exception sustained: information quashed.*

All concurred.